# In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1632

JOELLA K. WYNINGER,

*Plaintiff-Appellant,*

v.

NEW VENTURE GEAR, INC.,

*Defendant-Appellee.*

_____

**Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 01 C 310—Sarah Evans Barker**, *Judge*.

_____

ARGUED OCTOBER 29, 2003—DECIDED MARCH 19, 2004

_____


Before FLAUM, *Chief Judge*, and EASTERBROOK and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. The plaintiff, Joella Wyninger, alleges multiple violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* (2003), by her former employer, New Venture Gear, Inc. ("NVG").[1] Wyninger asserts that NVG tolerated or condoned a hostile work

_____

[1] NVG changed its name to Manual Transmissions of Muncie, LLC on February 1, 2003. For simplicity, we will continue to refer to the defendant as NVG.

environment based on gender, maintained unequal terms of employment, and fired her because of her sex and in retaliation for a sexual harassment complaint she made against her coworkers. The district court, after denying a motion to consider newly discovered evidence, granted summary judgment to NVG on all of Wyninger's Title VII claims. We affirm both the decision to exclude evidence and the grant of summary judgment.

## I. History

NVG, a joint venture created by General Motors Corp. and the former Chrysler Corp., produces automobile parts. Vendors supply NVG with unfinished component parts, which NVG processes and assembles into manual transmissions and drive-line components. One of NVG's facilities is located in Muncie, Indiana. This facility employs approximately 1300 workers on three shifts.

Joella Wyninger engaged in a variety of occupations before joining NVG. She worked as a gear cutter and in the tool crib at a manufacturing concern for nearly two years. She also worked for a short period of time as a car-seat inspector at a different manufacturer. Aside from manufacturing-related jobs, Wyninger worked as a waitress, a telemarketer, and at various retail establishments. Her brief experiences in supervisory roles came as a waitress and in retail.

After interviewing for the position of production supervisor at NVG's Muncie facility in April of 2000, Wyninger was hired under a ninety-day written contract. NVG informed her that she would be monitored during this trial period and that her employment could be made permanent if she performed well. NVG cites Wyninger's lack of manufacturing experience as the reason for this probationary period.

At about the same time Wyninger was hired, NVG hired three other production supervisors, all males. NVG placed Bill Timbs and Scott Brand as full supervisors. NVG placed Steve Lawrence as a supervisor-in-training, an intermediate position between full supervisor and a probationary contract position like that afforded to Wyninger. Timbs had over twenty years of experience in the military and nine years of supervisory experience in manufacturing. Brand had fourteen years of experience in manufacturing as a project manager. Lawrence had twenty years of experience in manufacturing and sixteen years of military experience. Wyninger was the only production supervisor who was not salaried and who lacked benefits. Her $25 per hour contractual rate of payment, however, meant that Wyninger earned roughly the same pay as her colleagues.

NVG initially assigned Wyninger as a trainee to the first shift in Department 5600, a machinery area. She "shadowed" a first-shift production supervisor, Randy Johnson, for at least three-to-four weeks to learn the job. Usually, production supervisors received this form of training for two weeks. Wyninger also received about twenty-nine hours of formal classroom training during the course of her employment with NVG. The other newly hired production supervisors received similar amounts of formal training: Brand received about twenty-eight hours, Lawrence received about seventeen hours, and Timbs received more than forty hours. The record is silent about the amount of on-the-job training provided to Brand, Lawrence, and Timbs. NVG did not formally train Wyninger to calculate overtime for her employees or to prepare inventory sheets for the next shift.

Department 5600 is divided into two sections: component preparation and an assembly line. Wyninger worked in the component preparation section, where hourly laborers perform preliminary tasks on unfinished components so that the components can be assembled into final products on the assembly line. Of particular importance to component

preparation is "heat treating" the components. Production supervisors like Wyninger manage the hourly employees to ensure efficient production. Among other things, the supervisors monitor and instruct forklift drivers, known at NVG as "truckers," so that the component materials are transported in a timely fashion to the heat-treat operation and subsequently to the assembly line.

After her initial training on first shift, Wyninger was assigned to second shift where she supervised approximately thirty employees. NVG assigned Earl Davis, an experienced supervisor, to help Wyninger with any difficulties she may have experienced during her first week on her own. She reported directly to the second-shift superintendant, Russell Wade. Bryant Allam, the Area Manager, was responsible for production in Department 5600 across all three shifts.

Wyninger faced obstacles to successfully maintaining the production flow on the second shift. Often the first-shift workers failed to leave the equipment and stock ready for continued production. Furthermore, the first-shift production supervisor (Johnson) did not always leave inventory lists for Wyninger to consult. Wyninger also frequently complained about inadequate trucker support. The strain of working in a fast-paced manufacturing environment was made more difficult by the vulgar language and fiery temper of the third-shift superintendent, Joe Crouch, who often talked to Wyninger at length when their time at the factory overlapped, and the similar behavior of second-shift superintendent Wade. Due to her lack of formal training in calculating overtime or preparing inventory sheets, Wyninger committed mistakes and was mocked by her supervisors. Wyninger was not paid overtime for routine paperwork she completed before or after her shift; she alleges that Johnson did receive overtime compensation.

On July 27, 2000, a production line went down in Department 5600. Wade had informed Wyninger that gears being

welded on her shift had to be taken to the heat-treat operation so that the gears would be ready for assembly. Five hours into her shift, Wyninger had not yet been able to send any gears to the heat-treat operation. This resulted in the shutdown, since the assembly line had no parts to process. Wade and Allam attributed the production line shutdown to Wyninger's failure to properly marshal her resources and personnel. Wyninger blamed the truckers and Wade for failing to help when she could not locate the truckers.

On August 1, 2000, Wyninger received a phone call from union committeeman Bob Slaven, her subordinates' union representative. Because Slaven represented the interests of the workers on Wyninger's shift, Wyninger often had to consult with Slaven about employee issues that arose. Slaven asked Wyninger about a job posting. When Wyninger replied that she had posted a job and was surprised Slaven had not come to look at "it," Slaven—apparently using the speaker feature on his telephone so other men in his office could listen to the conversation— responded with a sexual innuendo about the "it" to which Wyninger referred.[2] Wyninger heard several men laughing. After Wyninger hung up the phone in disgust, the phone rang again about one minute later and an unidentified voice—Wyninger thinks it was again Slaven and that

---

[2] Wyninger testified to the following account of the first phone call:

    Slaven: "Have you posted the Wera job yet?"

    Wyninger: "Yeah, it's, I believe, it's posted on the door—on the door in the office, I'm surprised you haven't come to look at it."

    Slaven: "Oh, you mean the posting?"

    Wyninger: "Yes, the posting."

    Slaven: "Oh, I was wondering what you wanted me to come and look at."

he was still using the speaker phone—asked twice, "You got any pussy you can hook me up with?"

On August 2, Slaven again called Wyninger and demanded that she come to his office to discuss an employee matter. Wyninger complied with Slaven's request. Once Wyninger entered, two union representatives followed her inside and locked the door—although in fact the door could still be opened by someone in the room. Wyninger unlocked the door, but the men re-locked it when she sat down. Slaven asked Wyninger about a sexual-harassment incident in her department involving another employee. After Wyninger described the resolution of the matter, Slaven asked Wyninger why she wouldn't answer the complaining employee's questions about her own preferences with regard to oral sex. The three men in the room laughed. Wyninger, again, was offended and distressed by the conduct of Slaven.

Wyninger initially complained to coworkers about the phone calls on August 1; she reported all of her complaints to human resources on August 2. On August 3, NVG human-resources personnel called Wyninger into work early, informed Wyninger that NVG had a "zero tolerance" policy with respect to sexual harassment, prompted Wyninger to write a report, gave her the night off with pay, and began an investigation into the complaint.

NVG was unsuccessful in its attempts to trace the August 1 phone calls, and Slaven denied involvement with the second call. Although Wyninger insists that both calls were received while Don Blakey (an NVG employee) was in her office, Blakey recalled only one phone call. NVG did place a device on Wyninger's phone to monitor all future calls to her office. NVG also investigated the August 2 meeting in Slaven's office. NVG interviewed all individuals present at the meeting; they insisted that they meant no harm and were only "kidding around." NVG determined that the door

could not lock anyone inside the room. On August 7, NVG concluded that there was insufficient evidence to punish Slaven or anyone else based on Wyninger's complaint because of the discrepancies in the accounts of the incidents related by the parties.

At the end of the ninety-day employment contract, set to expire on August 12, 2000, NVG determined that it would not extend Wyninger's employment. The human resources department had final authority to make hiring and firing decisions, although it took into consideration the opinions of those with direct supervisory roles, including the second-shift superintendant Wade and the Area Manager Allam. NVG cited Wyninger's failure to meet perform-ance expectations as the reason for its decision. Steve Lawrence, one of the other production supervisors hired during the same time period as Wyninger, was also term-inated by NVG for performance problems.

Wyninger filed a charge of discrimination with the Equal Employment Opportunity Commission on August 31, 2000, and subsequently received her right-to-sue letter on December 7, 2000. On March 7, 2001, Wyninger filed a complaint and demand for relief pursuant to Title VII in the Southern District of Indiana, alleging a hostile work environment, retaliation, and sex discrimination. NVG filed a motion for summary judgment on May 15, 2002. Wyninger filed her response on June 17, 2002. NVG filed its reply on July 1 and Wyninger filed her surreply on July 29.

On October 7, 2002, Wyninger filed a motion to consider newly discovered evidence. This evidence described the experience of another female employee, Lori Herchenroeder, at NVG. Herchenroeder had submitted a claim to the Indiana Civil Rights Commission alleging that NVG promoted an inferior male employee rather than her in retaliation for an earlier complaint to the Commission. On December 30, 2002, the magistrate judge denied

Wyninger's motion under Federal Rule of Evidence 403 because the evidence was likely to confuse the issues and waste time.

On February 5, 2003, the district court granted NVG's motion for summary judgment as to all federal claims.[3] Wyninger has appealed both the exclusion of evidence and the grant of summary judgment on all of her Title VII claims.

## II. Analysis

We review evidentiary rulings of the district court under an abuse of discretion standard. *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 621 (7th Cir. 2003). "To this end, we will not find error unless the court's decision is based on an erroneous conclusion of law or the record contains no evidence on which the court rationally could have based its decision . . . ." *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 570 (7th Cir. 1997).

We review de novo a grant of summary judgment; in doing so, we construe all facts in favor of the non-moving party. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2003).

---

[3] Wyninger also asserted Indiana common-law actions of promissory estoppel and intentional infliction of emotional distress in her complaint. Judge Barker dismissed these claims without prejudice after ruling in favor of NVG on the summary-judgment motion.

## A. The Evidentiary Ruling

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (2003).

The magistrate judge found that the proffered Herchenroeder evidence, concerning another female NVG employee's charge of gender discrimination, had limited probative value on any issue material to Wyninger's case because the evidence involved a different employment decision in a different department made by different decision-makers. Since the issues were separate and the evidence not particularly probative, the magistrate judge concluded that allowing this evidence would lead to undue delay and confusion of the issues. The parties would be forced to try a "case within a case" on the propriety of the employment action taken against Herchenroeder by NVG. It was also noted, though not relied on, that the Herchenroeder evidence was offered five months after the close of discovery and the submission of NVG's summary-judgment motion.

The district court did not abuse its discretion by excluding the Herchenroeder evidence. There is ample support in the record for the finding that the evidence involved different circumstances and would not be probative on the issues in Wyninger's case. Furthermore, since the Herchenroeder evidence consisted of contested allegations, we agree that the district court would have been forced to decide the merits of a separate case despite its limited probative value in Wyninger's case. In these circumstances, the district court was justified in refusing to grant the motion to consider newly discovered evidence. *See Tidemann v. Nadler Golf Car Sales, Inc.*, 224 F.3d 719, 723-25 (7th Cir. 2000); *Grassi v. Info. Res., Inc.*, 63 F.3d 596, 602-03 (7th Cir. 1995).

**B. Hostile Work Environment**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Thus, the statute prohibits an employer from "requiring people to work in a discriminatorily hostile or abusive environment." *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 701 (7th Cir. 2001) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In order to maintain an actionable claim of hostile work environment, Wyninger must first demonstrate that a supervisor or coworker harassed her because of her sex. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002). Next, she must show that the harassment was both subjectively and objectively "so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Id.* at 462-63 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)); *see also Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work. *Hilt-Dyson*, 282 F.3d at 463; *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001).

To hold NVG liable for the acts of Wyninger's coworkers, as opposed to the actions of supervisors or others higher in the chain of command, Wyninger must also demonstrate that NVG was negligent. *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 381 (7th Cir. 2002); *Adusumilli*, 164 F.3d at 361. An employer can be held responsible for the conduct of

coworkers in this context only if it "knew or should have known" about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice. *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001). In clarifying the employer's duty in coworker harassment cases, we have noted:

> If an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty. An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made. We are not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed.

*Id.* (quoting *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)).

Wyninger points to both specific incidents and general workplace conditions in attempting to establish a hostile work environment. The incidents involving Slaven, over the phone on August 1 and in Slaven's office on August 2, provide the strongest evidence of objectively hostile working conditions. Wyninger also asserts, however, that Crouch's and Wade's vexing personalities, the intransigence of the truckers, and general workplace difficulties help her to establish her claim.

In assessing the conduct of Crouch and Wade (individuals higher than Wyninger in the chain of command), it is clear that Wyninger has not established a genuine issue of material fact on whether she was harassed *because of* her gender. Wyninger cannot base a hostile environment claim upon Crouch's and Wade's vulgar language because,

at most, they are "crude individual[s] who treated [every-
one] poorly." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d
340, 346 (7th Cir. 1999). Other employees, including men,
were also afraid of and offended by Crouch's criticism and
vulgarity and insulted by Wade's approach to his supervi-
sory role. Crouch and Wade did not interact with Wyninger
any differently than they did with other male coworkers
and subordinates.

As to Wyninger's reliance on generalized workplace dif-
ficulties, the record conclusively shows that, regardless of
their sex, production supervisors had problems motivating
truckers to allocate their time properly and had trouble
keeping track of inventory. Wyninger's assertions that
she experienced difficulties in fulfilling her duties do not
prove, without more, that male production supervisors were
provided with easier work environments and superior
training by NVG. *See Hildebrandt v. Ill. Dep't of Natural
Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003) (noting in regard
to a hostile environment claim that "bare allegations not
supported by specific facts are insufficient in opposing a
motion for summary judgment" (internal quotations omit-
ted)).

Slaven's alleged comments and behavior, on the other
hand, which included the harassing phone calls and the
intimidating meeting in his office, are fairly read to be
motivated by Wyninger's gender. Furthermore, we accept
for present purposes that Wyninger found her environment
to be subjectively hostile as a result of these occurrences.

As we previously explained, Wyninger also must establish
that her workplace was objectively hostile because of
Slaven's actions. In evaluating whether she meets this ob-
jective test, we must keep the following in mind:

> Not every unpleasant workplace is a hostile environ-
> ment. The occasional vulgar banter, tinged with sexual

> innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is the one that is hellish.

*Rogers*, 320 F.3d at 752 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). Our case law has made clear that some acts going beyond occasional vulgar banter also fail to constitute an objectively hostile environment. *See, e.g., Pryor v. Seyfarth, Shaw, Fairweather, & Geraldson*, 212 F.3d 976, 977-78 (7th Cir. 2000) (male attorney showing female secretary pictures of women in bondage and black leather and asking about her wardrobe on several occasions); *Adusumilli*, 164 F.3d at 361-62 (brief instances of unwanted physical contact, including a poke to the buttocks); *Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir. 1993) (unwanted touches and attempts to kiss).

In considering the blunt and humiliating requests over the telephone (with an audience listening to the conversation) in conjunction with the arguably threatening atmosphere created by Slaven and the other two men in his office the next day, it is possible that these acts are severe enough to establish a hostile work environment despite a lack of evidence of pervasive sexual harassment or physical contact. Wyninger's allegations indicate that Slaven solicited sex in a crude and shocking manner. With that boorish solicitation from the previous day as a backdrop, Slaven used Wyninger's sense of duty to her work to lure her into a physically intimidating situation—a woman locked in a small room with three larger men, snickering at her refusal to discuss oral sex.

We need not decide whether Slaven's behavior constitutes an objectively abusive working environment, however, because "the question whether [NVG] took prompt and effective remedial action is dispositive here." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048-49 (7th Cir.

2000); *see also Longstreet*, 276 F.3d at 381-83 (prison not held liable for two instances of disgusting sexual behavior by coworkers because prompt and appropriate remedial action taken); *Berry*, 260 F.3d at 812-13 (airline not held liable for lengthy period of harassment by coworker because of prompt remedial action taken once notified).

NVG's response to Wyninger's complaint was "reasonable under the circumstances as then existed." *Berry*, 260 F.3d at 811 (quoting *McKenzie*, 92 F.3d at 480). Human resources requested a full written report from Wyninger, gave her the rest of her shift off with pay, and conducted a prompt, thorough investigation into the incidents. NVG failed in its attempt to trace the August 1 phone calls, but did place a device on Wyninger's phone so that any future harassment could be attributed to a particular actor. Blakey, the employee in Wyninger's office at the time of the alleged phone calls, was unable to confirm Wyninger's account as he recalled only one phone call during the time he was in her office. NVG also investigated the August 2 meeting and found that the door could not have locked Wyninger inside the room and that the men involved claimed to only be "kidding around." NVG concluded that there was insufficient proof to take disciplinary action against any of the individuals. Wyninger does not allege any further harassment in her remaining days at NVG.

NVG satisfied its obligation to maintain a harassment-free work environment under Title VII. *See Tutman*, 209 F.3d at 1048 ("In hostile work environment cases, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring."). NVG acted promptly and effectively in responding to Wyninger's complaint; no further harassing behavior occurred after August 2. Our determination in this regard could have been made easier had NVG reminded its employees of the company's written sexual harassment policy,

offered Wyninger an alternative to dealing directly with Slaven, and ordered the men to offer an apology to Wyninger for causing her grief. But we do not "sit as a super-personnel department." *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467, 471 (7th Cir. 2000). NVG's investigation was sufficient under the circumstances. We affirm the grant of summary judgment on this claim.

## C. Sex Discrimination

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Thus, in a case involving alleged discrimination on the basis of sex, "there are two primary issues to consider: first, was the purported difference in treatment prompted by plaintiff's sex, and second, did the difference in treatment affect plaintiff's compensation, terms, conditions, or privileges of employment." *Haugerud*, 259 F.3d at 691.

Wyninger presents three separate theories of sex discrimination. First, she argues that NVG hired her pursuant to a short-term contract with hourly wages and no benefits because of her gender. Second, she asserts that NVG maintained unequal terms of employment, including training and overtime pay, because of her gender. Third, she alleges that NVG fired her because of her gender.

An employee alleging sex discrimination can either proceed directly, by presenting direct and/or circumstantial evidence on the issue of discriminatory intent, or indirectly, by utilizing the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting method. *Haugerud*, 259 F.3d at

691. On each of her sex discrimination claims, Wyninger fails to establish a genuine issue of material fact using the direct method. She has presented no direct evidence and little circumstantial evidence to support her contention that NVG discriminated against her because of her gender.

To establish a prima facie case of sex discrimination under the indirect, or burden-shifting, method, the employee must demonstrate that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) at least one similarly situated employee, not in her protected class, was treated more favorably. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001); *Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir. 2001).

If the employee establishes a prima facie case, the employer can present contradictory evidence to raise a genuine issue of fact for trial. Or, the employer can produce evidence of a legitimate nondiscriminatory explanation of its adverse employment action; the employer would then be entitled to summary judgment unless the employee can rebut this explanation with evidence that it is pretextual. *Gordon*, 246 F.3d at 886. The employer's explanation can be "foolish or trivial or even baseless" so long as the company "honestly believed" in the reasons it offered for the adverse employment action. *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997); *see also Wade v. Lerner N.Y., Inc.*, 243 F.3d 319, 323 (7th Cir. 2001).

Wyninger's first theory of sex discrimination, that her hiring as an hourly probationary supervisor was based on her gender, fails to satisfy the fourth prong of the prima facie test. There are simply no similarly situated male employees to whom Wyninger can be compared. To be similarly situated to another employee, Wyninger must show that the employee is directly comparable in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676,

680 (7th Cir. 2002). In considering Wyninger's claim that her terms of employment at hiring were discriminatory because of sex, we must consider whether Timbs, Brand, and Lawrence had similar experience and other qualifications, or any other "differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000).

Timbs and Lawrence had substantial manufacturing and military experience prior to joining NVG. Brand had fourteen years of experience as a project manager. Wyninger had very limited manufacturing experience and no supervisory experience in a manufacturing environment. Because of their vastly superior work experience, none of the other production supervisors qualify as being similarly situated to Wyninger at hiring. Because no similarly situated individual, not in her protected class, was treated more favorably, her prima facie case fails.

Wyninger likewise cannot make a prima facie showing on her second theory of sex discrimination, that NVG maintained unequal terms of employment by providing inadequate training to her and refusing to pay her overtime. While true that Timbs received eleven more hours of formal classroom training than Wyninger, the other production supervisors received less formal training. Furthermore, Wyninger received at least three-to-four weeks of informal training under Johnson (he testified that she shadowed him even longer) rather than the standard two weeks. Also, Wyninger was introduced to Earl Davis, an experienced supervisor, so that she could seek his help with any problems that might come up after she was placed on her own shift. As to training, there is insufficient evidence of either an adverse employment action or more favorable treatment of a similarly situated employee.

As to overtime pay, Wyninger cannot prove that she was subjected to an adverse employment action. Overtime at NVG had to be pre-approved by supervisors and was only

approved for specific project-related tasks, not for routine paperwork and other administrative tasks. Wyninger alleges only that Johnson received overtime, not that he received overtime pay for paperwork and administrative tasks. She does not contest that NVG refused to pay over-time wages to supervisors for finishing paperwork after or before their shifts, but that is the work for which she now—Wyninger failed to submit overtime hours while she worked at NVG—seeks compensation.

Wyninger's third and final theory of sex discrimination, that NVG fired her because of her gender, comes closest to establishing a prima facie case under the indirect method. Since NVG relied on Wyninger's job performance as its explanation for firing her and because those assessing Wyninger's performance are the same parties accused of discrimination, Wyninger does not need to present evidence at the prima facie stage that she was performing her job satisfactorily. *See Curry v. Menard, Inc.*, 270 F.3d 473, 477-78 (7th Cir. 2001); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 n.3 (7th Cir. 2001); *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999).

Once Wyninger joined the ranks of production supervisor, she became similarly situated to the other individuals performing that job. Because only one similarly situated employee, Lawrence, was fired, others were treated more favorably than Wyninger. Wyninger and Lawrence, though, were the only two production supervisors hired in 2000 that were criticized for performance issues, and both were fired. Moreover, only Wyninger was blamed by NVG for an assembly line shutdown during the relevant period. These facts remove Timbs and Brand, the two male production supervisors hired around the same time as Wyninger who had satisfactory job performances and weren't fired, from the class of similarly situated individuals. Thus, Wyninger does not present a prima facie case of sex discrimination for her firing.

Even if Wyninger could establish a prima facie case, NVG is still entitled to summary judgment because it has presented an unrebutted, nondiscriminatory explanation for Wyninger's firing. NVG cites the production line shutdown on July 27 and other performance problems as its reason for choosing not to retain Wyninger. Wyninger tries to rebut NVG with two separate arguments. The first is that she was not actually the one to blame for the July 27 incident and that she completed the rest of her work without major incident and, indeed, without significant criticism.[4] The second is to point to the lack of records kept by NVG to justify its performance and experience-based explanations.

An employee's self-evaluation cannot create an issue of fact about an employer's honest assessment of inadequate performance. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994); *Gustovich v. AT&T Communications Inc.*, 972 F.2d 845, 848 (7th Cir. 1992). Wyninger has not presented evidence that other production supervisors were blamed for serious problems in the manufacturing process but escaped firing. Even if we assume that Wyninger satisfactorily completed her job during most of the ninety days she worked at NVG, this does nothing to rebut NVG's significant dissatisfaction with Wyninger's July 27 performance. Wyninger admits that she was aware that her supervisors, Wade and Allam, and NVG management were dissatisfied with her performance on July 27. Finally, the employer's lack of corroborating written evidence is not enough by itself to rebut the employer's nondiscriminatory explanation for adverse employment actions against an employee. We affirm the grant of summary judgment on Wyninger's sex discrimination claim.

---

[4] NVG, of course, contests this factual assertion.

**D. Retaliation**

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Thus, under Title VII, "unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination." *Rogers*, 320 F.3d at 753.

Like a sex discrimination charge, there are two distinct ways for an employee to pursue a retaliation charge. The first is to proceed under the direct method. *Rogers*, 320 F.3d at 753. Both direct evidence, such as an admission of guilt by the employer, and circumstantial evidence can be considered under the direct method; the employee must show that she engaged in protected activity and suffered an adverse employment action as a result. *Id.*; *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). There is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, but it is clear that "mere temporal proximity" is not enough to establish a genuine issue of material fact. *Stone*, 281 F.3d at 644. If the employee's evidence is uncontradicted, the employee is entitled to summary judgment; if the employer contradicts evidence presented under the direct method, then "the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if" the defendant lacked a retaliatory motive. *Id.*

Wyninger alleges that her firing (or, the non-renewal of her contract) constitutes retaliation for her complaint against Slaven. Beyond suspicious timing, however, there is little evidence in the record to indicate that her retalia-

tion claim has any merit. Thus, Wyninger cannot establish a retaliation claim through the direct method.

Under the indirect method of pursuing a retaliation claim, based on the burden-shifting analysis in *McDonnell Douglas*, an employee is entitled to summary judgment if he presents uncontradicted evidence that "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner[.]" *Stone*, 281 F.3d at 642. The employer can survive a summary judgment motion by presenting contradictory evidence in response to the employee's prima facie case; the employer is entitled to summary judgment despite the employee's prima facie case "[i]f the [employer] presents unrebutted evidence of a noninvidious reason for the adverse action." *Id.* at 644. The reason provided for the adverse action can be "good or bad, provided only that it is not one that the law forbids." *Id.* at 642.

Wyninger also cannot establish her claim through the indirect method. Since Lawrence, an otherwise similarly situated production supervisor, did not complain and yet was fired for performance difficulties in the same time period, Wyninger has not made a prima facie case. Even if Wyninger was able to establish a prima facie case, NVG has presented a legitimate, non-retaliatory reason for her dismissal: the shutdown of the manufacturing line on July 27, 2000 that NVG management blamed on Wyninger. *See supra* Part IIC. It does not matter that NVG may have been mistaken about the cause of the fiasco; as long as NVG honestly believed that Wyninger's lack of supervisory ability was to blame, this reason is sufficient.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the exclusion of newly discovered evidence and the grant of summary judgment on all federal claims.


A true Copy:

      Teste:


           _____
           *Clerk of the United States Court of*
           *Appeals for the Seventh Circuit*

USCA-02-C-0072—3-19-04