In the

# United States Court of Appeals

### For the Seventh Circuit

————————

No. 07-2679

WILLIAM J. BETTNER,

*Petitioner*,

*v.*

ADMINISTRATIVE REVIEW BOARD,
United States Department of Labor,

*Respondent*,

and

CRETE CARRIER CORPORATION,

*Intervening Respondent*.

————————

Petition for Review of
an Order of the Department of Labor.
No. 06-013

————————

SUBMITTED APRIL 9, 2008—DECIDED AUGUST 21, 2008

————————

Before POSNER, RIPPLE and MANION, *Circuit Judges*.

RIPPLE, *Circuit Judge*.  On December 6, 2003, William
Bettner filed a complaint with the Occupational Safety and
Health Administration ("OSHA"), an agency within the

Department of Labor, alleging that his employer, Crete Carrier Corp. ("Crete"), had discriminated against him in violation of the Surface Transportation Assistance Act, 49 U.S.C. § 31105 ("STAA"). OSHA entered a preliminary finding against Mr. Bettner, and he requested de novo review before an Administrative Law Judge ("ALJ") under 49 U.S.C. § 31105(b)(2)(C).

Before the ALJ, Crete filed a motion for summary decision under 29 C.F.R. § 18.40. On October 28, 2005, the ALJ issued a recommendation to grant Crete's motion for summary decision. On May 24, 2007, the Department of Labor's Administrative Review Board (the "Board") issued a final decision granting Crete's motion. Mr. Bettner filed a timely petition for review. For the reasons set forth in this opinion, we deny Mr. Bettner's petition.

# I

## BACKGROUND

### A.

The Department of Transportation ("DOT") regulates, inter alia, the number of hours a commercial truck driver may drive in a given period. In 49 C.F.R. § 395.3, the DOT establishes the maximum number of hours that a driver may drive during any given day, as well as the maximum number of hours that a driver may drive during any given week; it also mandates the minimum number of consecutive hours off-duty that must be observed between shifts of driving. At the time relevant to

this appeal,[1] section 395.3 prohibited a motor carrier from requiring any driver to drive "[m]ore than 10 hours following 8 consecutive hours off duty," or "for any period after . . . [h]aving been on duty 60 hours in any 7 consecutive days . . . or . . . 70 hours in any period of 8 consecutive days." 49 C.F.R. § 395.3 (2002). In addition to these driving limitations, 49 C.F.R. § 395.8 establishes minimum reporting requirements. During each 24-hour period, the driver must record in a driving log his status, the date, the 24-hour starting time, the carrier, the truck number, the number of miles driven that day, and the total hours spent driving and on duty. *Id*. § 395.8(d), (f).

Despite the DOT's numerous regulations, however, in the early 1980s, the United States experienced an increasing number of deaths, injuries and property damage due to commercial motor vehicle accidents. *See* 128 Cong. Rec. 32,509, 32,510 (1982) (remarks of Sen. Danforth and summary of proposed statute) (quoted in *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 258 (1987)). Random inspections by law enforcement officials in various parts of the country uncovered significant and widespread violations of safety regulations. *Id*. (quoted in *Brock*, 481 U.S. at 262).

---

[1] In April 2003, the Department of Transportation amended the regulation to increase the applicable hours limit, prohibiting employers from requiring drivers to drive more than "11 cumulative hours following 10 consecutive hours off duty." 49 C.F.R. § 395.3 (2003). Although the incidents in this case took place between October 3 and October 8, 2003, the amended regulation is not applicable because it did not go into effect until January 4, 2004. 68 Fed. Reg. 22,456, 22,514 (Apr. 28, 2003).

Congress hypothesized that, although employees in the transportation industry often are in the best position to detect safety violations, fears or threats of discharge for cooperating with enforcement agencies were preventing these employees from reporting these violations. *See Brock*, 481 U.S. at 258.

Accordingly, in 1982, Congress enacted the STAA, an Act intended to provide employees with express protection against retaliation for reporting noncompliance with safety regulations. *Id*. The STAA makes it unlawful for an employer to "discharge an employee, or discipline or discriminate against an employee regarding pay, terms, or privileges of employment," for refusing to operate a commercial vehicle because "the operation violates a regulation, standard, or order of the United States related to commercial motor vehicle safety, health, or security." 49 U.S.C. § 31105(a)(1)(B)(i).

An employee who believes that he has been retaliated against for engaging in an activity protected under the STAA may file a complaint with the Department of Labor. *Id*. § 31105(b). OSHA then investigates the claim and orders relief if it finds reasonable cause to believe that the STAA has been violated. *Id*. § 31105(b)(2)(A). Either party, however, may object to OSHA's findings and request a de novo proceeding before an ALJ. *Id*. § 31105(b)(2)(B). The ALJ may hold a hearing; alternatively, it may issue a summary decision for either party "if the pleadings, affidavits, material obtained by discovery or otherwise, or matters officially noticed show that there is no genuine issue as to any material fact and that a party is entitled to summary decision." 29 C.F.R. § 18.40(d).

Once the investigating body has recommended a decision, the parties may submit briefs to the Board. 29 C.F.R. § 1978.109(c)(1). The Board then makes a final determination and, if warranted, orders relief. A party aggrieved by the final decision of the Board may petition for review in the appropriate court of appeals. 49 U.S.C. § 31105(c).

**B.**

At all times relevant to this case, Crete, an over-the-road trucking company, operated at least two distinct fleets of trucks: (1) a fleet dedicated solely to shipments of goods for a single customer, General Mills/Pillsbury (the "Dedicated Fleet"), and (2) a non-designated fleet (the "National Fleet"). For the Dedicated Fleet, Crete guaranteed that a certain number of tractors, trailers and drivers would be used exclusively to haul General Mills' goods; it also guaranteed that it would pick up and deliver freight at specific times designated by General Mills. General Mills tightly enforced the timing requirements for its pickups and deliveries. Any pickup or delivery that occurred outside the designated time window was considered a "Service Failure," which resulted in penalties to Crete. In return for these timing guarantees, General Mills paid Crete a premium rate and allocated to Crete a certain percentage of its daily freight.

In contrast with the Dedicated Fleet, equipment and drivers in Crete's National Fleet were not assigned to particular customers. Because premium payment was not contingent upon compliance with scheduled pickup and delivery times, proper scheduling was not as critical for

National Fleet drivers. Therefore, National Fleet drivers were dispatched on a more ad-hoc basis than those assigned to the Dedicated Fleet.

In late August or early September 2003, Crete hired Mr. Bettner as a truck driver and assigned him to the Dedicated Fleet. In that position, he was tasked with performing pickups and deliveries for General Mills, each to be completed within certain windows of time. Crete's dispatchers compiled the pickup and delivery time windows into planned dispatches for its drivers; from these dispatches, however, the individual driver was responsible for planning his specific route, driving time, breaks, maintenance checks and all of the other details of his trip in order to comply with both General Mills' schedule and the DOT hours of service regulations.

On October 3, 2003, a Crete dispatcher provided Mr. Bettner with a dispatch consisting of three separate pickups and deliveries. Mr. Bettner was to pick up a load at Geneva, Illinois that evening and deliver it in Atlanta, Georgia on the morning of October 6. Later on October 6, he was to pick up another load in Lavergne, Tennessee; this load was to be delivered to a facility in Geneva, Illinois on October 7, between noon and 11 p.m. Finally, he was to pick up a third load in Kankakee, Illinois at 3:00 p.m. on October 7, and deliver it in Joplin, Missouri by 11:00 p.m. the following day. The dispatch read as follows:

    1. Pickup Location/Window
    Geneva, Illinois - 10/03/03 - 5:00p.m.-11:59pm
    Delivery Location/Window
    Atlanta, Georgia - 10/06/03 - 12:01a.m.-12:00pm

2. Pickup Location/Window
Lavergne, Tennessee - 10/06/03 - 8:30am-5:00pm
Delivery Location/Window
Geneva, Illinois - 10/07/03 - 12:01pm-11:00pm

3. Pickup Location/Window
Kankakee, Illinois - 10/07/03 - 3:00pm
Delivery Location/Window
Joplin, Missouri - 10/08/03 - 11:00pm

R.37.

### 1. Geneva to Atlanta dispatch

Mr. Bettner picked up his first dispatch in Geneva on the evening of October 3, within the pickup window designated by General Mills. He then went off duty until 1:00 a.m. on October 5, when he began his drive to Atlanta. He logged 10.75 hours of driving on October 5.

On October 6, beginning at 7:00 a.m., Mr. Bettner drove the remaining 3 hours to Atlanta, taking a lengthy break around 8:00 a.m. He arrived in Atlanta around 11:00 a.m., which was within the specified 12:01 a.m. to 12:00 p.m. delivery window. Because of delays at the Atlanta facility, however, his trailer actually was not unloaded until 12:45 p.m., almost one hour after the delivery window had closed. Accordingly, the load was considered late by General Mills. Mr. Bettner testified in his deposition that he knew that waits in the Atlanta depot were not uncommon, and he acknowledged that his truck might have been unloaded within the delivery window had he arrived earlier. R.33, Ex. A at 161, 164-65.

### 2. Lavergne to Geneva dispatch

Mr. Bettner left Atlanta around 1 p.m. on October 6 and drove approximately 1.5 hours toward Lavergne. He then contacted the customer in Lavergne to see if his next load was ready to be picked up, but he was told that the load would not be ready until later that night. Because that load was delayed, he went off duty for a few hours and then completed the 4-hour drive to Lavergne. He arrived in Lavergne at 7:45 p.m.; he picked up his second load and then drove for approximately 1 hour toward the delivery point in Geneva, before going off duty for the night at 10:00 p.m. Mr. Bettner logged a total of 8.75 hours of driving on October 6.

After an 11.5-hour rest, Mr. Bettner went on duty at 9:30 a.m. on October 7. He inspected his truck, and then he resumed the drive to Geneva. Sometime around 3:00 p.m., when he was scheduled to pick up his next load in Kankakee, Mr. Bettner sent Crete a message stating that his pickup time in Kankakee needed to be rescheduled because he had not yet completed his Geneva delivery. Crete later sent Mr. Bettner a message informing him that the Kankakee load had been rescheduled and could be picked up early the next morning.

Mr. Bettner dropped off his load in Geneva at 8:45 p.m. on October 7, within the 12:01 p.m. to 11:00 p.m. delivery window. Kankakee, Illinois, was 70 miles from Geneva via state highways. He had driven 8.75 hours already that day, and he did not believe that he could complete the trip to Kankakee without exhausting his permitted number of hours under the DOT regulations. Accordingly, he drove for one hour to a truck stop in Morris, Illinois, where

he entered his sleeping berth at 11:15 p.m. and stayed overnight. Mr. Bettner logged a total of 9.75 hours of driving on October 7.

While stopped in Morris, Mr. Bettner sent a Qualcomm message to Crete inquiring about the rescheduled pickup time in Kankakee. Crete responded that he had a new pickup appointment for 7:00 a.m. Mr. Bettner sent a message to Crete stating: "WILL NOT BE ABLE TO BE @ SHIPPER @ 7:00, OUT OF HOURS." Supp. App. at 69.

At 7:30 a.m. on October 8, approximately 8 hours after he had ended his shift the night before, Mr. Bettner inspected his truck and resumed driving. He arrived in Kankakee, Illinois at 9:00 a.m., 18 hours after his original pickup time and 2 hours after his rescheduled pickup time.

### 3. Kankakee to Joplin dispatch

At 11:15 a.m. on October 8, after his trailer was loaded, Mr. Bettner left Kankakee, Illinois and began his drive to Joplin, Missouri. He stopped for a 45 minute lunch break and, later, an unexplained 3.75 hour break from 2:45 p.m. to 6:30 p.m. During that break, Mr. Bettner sent another Qualcomm message to Crete: "WILL NOT BE ABLE TO GET TO RECEIVER BY END OF DAY, WILL BE OUT OF HOURS FOR ONE THING, WILL BE THERE FIRST THING IN MORNING . . . ." *Id*. at 72. Mr. Bettner drove until 11:30 p.m., stopping in Doolittle, Missouri to sleep. He logged a total of 8.5 hours of driving on October 8. He did not reach Joplin, Missouri in time for his 11:00 p.m. delivery window.

While in Doolittle, Mr. Bettner received another pre-
planned dispatch from Crete. It indicated that his next
shipment would be from Joplin, MO to Kalamazoo, MI,
and it would be loaded in Joplin at 9:00 a.m. on October 9.
Crete then sent a message to Mr. Bettner requesting his
estimated time of arrival in Joplin as well as an update
on his service hours from the previous day. Mr. Bettner
responded that his 8-hour break would not be complete
for another half hour, and he was still 3 or 4 hours away
from his delivery destination in Joplin.

Crete and Mr. Bettner then exchanged several Qualcomm
messages regarding Mr. Bettner's late loads. As part of this
conversation, Crete stated:

> PPLAN INFO WAS SENT TO U LAST FRIDAY
> SHOWING U IT LIVE LOADED TUESDAY AFTER-
> NOON WHICH WLD HAVE ALLOWED U TO BE ON
> TIME LAST NIGHT TO JOPLIN, PLSE KEEP CLOSE
> ATTN TO PPLAN TIMES.

*Id*. at 42. Mr. Bettner sent the following response:

> I SEND IN MY HOURS EVERY DAY SO YOU
> SHOULD BE AWARE OF MY HOURS. . . . IT IS NICE
> TO HAVE PRE-PLANNED LOADS, BUT I AM ONE
> PERSON AND NOT A TEAM.

*Id*. at 45. A Crete dispatcher sent a reply, stating:

> its up to you to keep track of your hrs, I am planning
> loads based on approx 500mi a day and when a load is
> picked up late . . . it throws the rest of the week off.

*Id*. at 46. Mr. Bettner answered:

I DO KEEP TRAK OF MY HOURS AND I KNOW WHEN YOU LOAD AND UNLOAD 6 TIMES A WEEK, FUEL UP, VI'S AND OTHER THINGS THAT TAKE ON DUTY TIME I WILL RUN UP AGAINST THE CLOCK. SHORT RUNS RUN A DRIVER RIGHT INTO THE GROUND, THERE IS NO GETTING AROUND THAT.

*Id*. at 49. Crete's dispatcher then stated:

LAST FRI U PICK UP IL TO GA, SHOWED U 2 PPLANS, MON TN TO IL, THEN TUES LIVE LD IN IL TO DLV JOPLIN YESTERDAY. U PICKED UP LOAD U HAVE NOW LATE . . . IT HAD TO BE RESET, NOW U ARE DELIVERING IT LATE, NOW WE WILL BE LATE PICKING UP YOUR PPLAN OUT OF JOPLIN TODAY . . . .

LOAD THAT DLV TO GA THIS PAST MONDAY SHLD HAVE BEEN DROPPED EARLY MON MORNING RATHER THAN AROUND 1200, THIS PUT THE WHOLE WEEK BEHIND & DIDN'T ALLOW U TO PICK UP TN LD TILL MONDAY NIGHT THEN DIDN'T ALLOW U TO DLV TO IL TO TUES NIGHT WHICH MISSED THE PICK UP TIME FOR LD U ARE ON NOW.

*Id*. at 50-51.

Mr. Bettner responded that he had picked up his loads in Atlanta and Lavergne within the specified window of time; he also noted that the load in Lavergne had just been loaded when he got there, so an earlier arrival "would have made no difference" in his ability to meet the dead-

line for his later shipments. *Id*. at 53. Crete, in turn, replied that Mr. Bettner needed to plan properly for contingencies. *Id*. at 58.

Accordingly, after conducting a vehicle inspection, Mr. Bettner resumed his driving at 9 a.m. on October 9. He took a brief lunch break, and he arrived in Joplin to deliver his shipment at 1:00 p.m., 14 hours after the original delivery window had closed. He asserts that the drive from Morris, Illinois to Kankakee, Illinois, to Joplin, MO took 11.5 hours; therefore, he submits, he could not have completed it within a single day under the then-existing DOT regulations. *See* 49 C.F.R. § 395.3 (2002).

### 4.  Subsequent Events

Because Mr. Bettner was late dropping off his load in Joplin, he also was unable to pick up his next load at the previously scheduled 9:00 a.m. pickup time. Instead, he picked up his new load at 2:30 p.m. in Joplin; he then began driving to Kalamazoo.

On October 10, after he also missed the delivery window in Kalamazoo by a significant amount of time, Crete sent Mr. Bettner a message indicating that it was transferring him from a truck-driving position with the Dedicated Fleet to a truck-driving position with the National Fleet. The next day, Mr. Bettner spoke with a manager, who told him that he was being transferred because he routinely failed to pick up and deliver his loads on time.

Mr. Bettner returned to Crete's terminal on October 12, 2003, to have his assigned truck serviced; he was informed

that his truck would not be ready until the next day. The next morning, when he arrived to pick up his truck, Mr. Bettner was informed that the remainder of his pre-planned dispatch on the Dedicated Fleet had been reassigned to another driver. Based on this information, Mr. Bettner assumed that he had been fired. He removed his belongings from his truck and sent Crete a Qualcomm message indicating that he believed that he had been fired when he was switched from the Dedicated Fleet to the National Fleet. Mr. Bettner did not report to work again.

## C.

Mr. Bettner filed a complaint with OSHA on December 6, 2003. He claimed that Crete transferred him to the National Fleet in retaliation for his refusal to violate DOT hour restrictions, in violation of the STAA. In his view, the position with the National Fleet was inferior to the position with the Dedicated Fleet because (1) National Fleet drivers are away from home for greater periods of time than drivers for the Dedicated Fleet, (2) Dedicated Fleet drivers carry a greater number of "drop-and-hook" loads than the National Fleet drivers, and therefore they spend less time in the terminals loading and unloading trailers and more time driving, and (3) a number of the National Fleet deliveries require the driver to help load and unload, a physically difficult task. Mr. Bettner requested reinstatement to his former position on Crete's Dedicated Fleet.

OSHA investigated the claim and, on February 23, 2004, found that it lacked merit. Mr. Bettner then requested that the matter be assigned to an ALJ. On October 28, 2005, after

reviewing the pleadings and the evidence, the ALJ also recommended that Mr. Bettner's complaint be dismissed, finding that Mr. Bettner had failed to establish a genuine issue of material fact relevant to his STAA claim. Specifically, it found that Mr. Bettner had failed to establish that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) Crete's legitimate, non-discriminatory justification for transferring him was mere pretext for retaliation.

The parties filed supplemental briefs with the Board. On May 24, 2007, the Board accepted the ALJ's recommendation and dismissed Mr. Bettner's complaint. The Board noted that Crete had presented unrebutted evidence that it had transferred Mr. Bettner to the National Fleet, where proper timing of deliveries was not as critical, because of its belief that Mr. Bettner had difficulty in planning his timing and routes in order to complete his dispatches on time. Because Mr. Bettner failed to adduce any evidence that Crete's proffered reason for transferring him to the National Fleet was pretextual, the Board concluded that there was no question of fact as to Crete's legitimate, non-discriminatory justification. It did not address the other issues addressed by the ALJ.[2] Mr. Bettner then timely filed a petition for review.

---

[2] Accordingly, we also do not address whether Mr. Bettner engaged in protected activity or whether he suffered an adverse employment action. *See Moab v. Gonzales*, 500 F.3d 656, 659-60 (7th Cir. 2007) (discussing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), and *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), and noting that "the opinion of the Board is free-standing and, therefore, must be the exclusive focus of our review").

## II

## DISCUSSION

Under 29 C.F.R. § 18.40(d), an ALJ "may enter summary judgment for either party if the pleadings, affidavits, material obtained by discovery or otherwise, or matters officially noticed show that there is no genuine issue as to any material fact and that a party is entitled to summary decision." Although we generally review a final decision and order of the Board with some level of deference, the parties here each assert that, because the ALJ's decision was made without a hearing on "summary judgment," we should review the Board's decision de novo. We need not resolve this issue here, however, because the result in this case is the same under either standard of review.

In STAA retaliation cases, the Board has adopted the familiar burden-of-proof framework that we developed for pretext analysis under other federal discrimination laws, such as Title VII. *Feltner v. Century Trucking, Ltd.*, ARB No. 03-118 (Oct. 27, 2004). Under this framework, a party attempting to prove a retaliation claim may proceed under either the direct or indirect method of proof. *See Roadway Express, Inc. v. Dep't of Labor*, 495 F.3d 477, 481 (7th Cir. 2007).

Before the ALJ and the Board, Mr. Bettner elected to proceed only under the indirect, burden-shifting method of proof. According to that method, the employee can create an inference of discrimination or retaliation by introducing the evidence necessary to establish a prima facie case. *Id*. at 481-82. As we noted in *Roadway Express*, an employee may establish a prima facie case of retaliation

under the STAA by showing: "1) that he engaged in protected activity under the STAA; 2) that he was the subject of adverse employment action; and 3) that there was a causal link between his protected activity and the adverse action of his employer." *Id*. Once that inference is established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id*. at 482. If the employer satisfies this burden, then the rebuttable presumption of discrimination is dissolved, and the employee must produce evidence to suggest that the employer's proffered reason for the termination is a mere pretext for an unlawful discharge. *Id*.; *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000). Summary judgment may be granted in favor of the defendant if he "presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).

Here, Mr. Bettner submits that he engaged in protected activity when he refused to drive more hours than were permitted under the DOT regulations. He contends that Crete's decision to transfer him to the National Fleet was an adverse employment action, and he submits that the action was taken in retaliation for his engaging in protected conduct. As evidence of causation, Mr. Bettner relies solely upon the "suspicious timing" of the transfer—a few days after his refusal—as circumstantial evidence suggesting retaliation.

Assuming, as the Board did, without deciding, that Mr. Bettner has succeeded in establishing a prima facie case of

discrimination, we look to whether Crete articulated a legitimate, non-discriminatory reason for Mr. Bettner's transfer. Crete submits that Mr. Bettner was transferred because the company believed that he had poor planning skills and a history of late deliveries. Because planning and timing were essential for drivers on the Dedicated Fleet, but not nearly as critical for drivers in the National Fleet, Crete simply transferred Mr. Bettner to an assignment where it could best utilize his driving skills.

Crete's explanation finds ample support in the record. It is undisputed that timely pickups and deliveries on the Dedicated Fleet were critical both to General Mills, in an effort to control its inventory, and to Crete, in an effort to avoid penalties. During the brief time that Mr. Bettner drove for the Dedicated Fleet, Crete's dispatcher, Chris Lingbloom, complained often to Mr. Bettner about his late deliveries and his failure to plan a proper route. *See* Supp. App. at 42, 46, 50-51, 58-59, 67. Lingbloom testified in an affidavit that he informed Crete's management about Mr. Bettner's difficulties in planning and completing routes on time, and soon thereafter Mr. Bettner was transferred from the Dedicated Fleet to the National Fleet. *Id*. at 89. Threne Greenfield, a manager, also submitted an affidavit stating that Mr. Bettner was transferred to the National Fleet because "he routinely failed to timely deliver and/or pick up loads." *Id*. at 86.

Before the ALJ, Mr. Bettner produced no evidence challenging Crete's proffered explanation. Indeed, he failed even to address the issue in his response to Crete's motion for summary decision. He merely reasserted that

the suspicious timing of his transfer alone could support
a finding that Crete transferred him because of his pro-
tected activities. As we consistently have held, however,
suspicious timing may be enough to fulfill the plaintiff's
minimal burden of establishing a prima facie case, but
suspicious timing alone generally is insufficient to estab-
lish a genuine issue of material fact for trial. *Buie v.
Quad/Graphics, Inc.*, 366 F.3d 496, 506-07 (7th Cir. 2004);
*Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th
Cir. 2004); *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029,
1034 (7th Cir. 1999).

Mr. Bettner's contention on appeal—that it was, in fact,
impossible for him to complete the planned dispatches
without violating the DOT hours requirement—also is
insufficient to create a genuine issue of material fact. He
does not allege that it was impossible for *any* driver to
comply with both the planned dispatches and the DOT
hours-of-service regulations;[3] he contends only that the
circumstances of his trip made it impossible for *him* to
complete his deliveries on time, and that his failure to
pick up and deliver his shipments timely therefore was
not his fault. Whether Mr. Bettner's failure to complete
his assignments timely was due to his own inability to
plan his routes or to circumstances beyond his control,

---

[3] Of course, if the company had dispatched drivers on routes
that were objectively impossible to complete while complying
with the DOT regulations, and then threatened them with an
adverse employment action if they did not complete their
deliveries on time, this would be a different case.

however, is irrelevant to his retaliation claim. Our inquiry in a retaliation claim is limited to the belief of the decisionmakers, whether or not that belief is reasonable. *See Culver*, 416 F.3d at 547 (noting that "the issue before us is not whether an employer's evaluation of the employee was correct but whether it was honestly believed"); *see also Wyninger*, 361 F.3d at 981; *Kahn v. Sec'y of Labor*, 64 F.3d 271, 278 (7th Cir. 1995).

Moreover, Mr. Bettner likely waived this issue by failing to assert it before the ALJ. As the Board noted in its opinion:

> In this case, Bettner failed to adduce any evidence, either direct or indirect, that Crete's proffered reason for transferring him to the national fleet was untrue. As indicated above, the ALJ found that not only did Bettner fail to produce any evidence to suggest that the transfer was a pretext for discrimination, he did not even address the issue. Moreover, once alerted to this deficiency by the ALJ, Bettner made no attempt to rectify his omission or rebut the ALJ's conclusion on appeal. While Bettner expended a large part of his appeal brief attempting to convince the Board that it was not his fault that he failed to timely deliver and pick up his loads, he made no attempt to show that Crete did not believe that his failure to timely pick up and deliver his loads was due to poor planning on his part.

*Bettner v. Crete Carrier Corp.*, ARB No. 06-013, at 15 (May 24, 2007).

Crete presented evidence that it honestly believed that Mr. Bettner lacked the planning skills necessary to com-

plete timely the deliveries on the Dedicated Fleet and that this had been the motivation for its decision to transfer him to the National Fleet. Our task is not to determine whether Crete was correct in its view, but whether the record establishes that it had a reasonable, non-retaliatory basis for its decision. Here, we believe that Crete has made such a showing. The record establishes that, out of the three deliveries originating from the pre-planned dispatch, Mr. Bettner was late delivering his shipments to Atlanta and Joplin, and he failed to arrive on time to pick up his loads in Lavergne and Kankakee. Four service failures were issued to Crete due to Mr. Bettner's failure to deliver or pick up shipments in a timely manner. Numerous Qualcomm messages between the parties substantiate Crete's belief that Mr. Bettner's failure to plan ahead was the reason for his tardy deliveries.

Crete is entitled to summary judgment if it presents "unrebutted evidence" that it would have taken the same action in the absence of the employee's protected conduct. *Culver*, 416 F.3d at 546 ("The persuasiveness of the defendant's explanation is normally for the finder of fact to assess, unless . . . the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive." (internal citations and quotation marks omitted)); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). The ALJ determined that Crete had presented unrebutted evidence of a non-retaliatory motive for its action, and it found in favor of Crete. The Board agreed. We conclude that the ALJ and the

Board correctly determined that Mr. Bettner failed to carry his burden to produce evidence rebutting Crete's proffered non-retaliatory justification; accordingly, they properly granted summary decision in favor of Crete.

## Conclusion

For the reasons explained in this opinion, we deny Mr. Bettner's petition for review.

PETITION for review DENIED